PHOENIX MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

William Jackson ADAMS, IV, Defendant–Appellant,

Rosita L. Adams, Defendant–Appellee.

No. 93–2119.

United States Court of Appeals, Fourth Circuit.

Argued April 13, 1994.

Decided July 27, 1994.

**ARGUED:** William Ussery Gunn, Holcombe, Bomar, Cothran & Gunn, P.A., Spartanburg, SC, for appellant. Blaney A. Coskrey, III, Glenn, Irvin, Murphy, Gray & Stepp, Columbia, SC, for appellee. **ON BRIEF:** Perry D. Boulier, Holcombe, Bomar, Cothran & Gunn, P.A., J. Mark Hayes, II, Harrison & Hayes, Spartanburg, SC, for appellant. Wilmot B. Irvin, Glenn, Irvin, Murphy, Gray & Stepp, Columbia, SC, for appellee.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Chief Judge ERVIN and Senior Judge HARVEY joined.

## OPINION

MURNAGHAN, Circuit Judge:

Following the death of William Jackson Adams III (Bill), his son William Jackson Adams IV (Jack), and his wife Rosita, both claimed the proceeds of one of Bill's life insurance policies. The insurer, Phoenix Mutual Life Insurance Company (Phoenix), filed an interpleader action with the United States District Court for the District of South Carolina on December 16, 1991. Phoenix deposited the proceeds of the policy with the registry of the court and asked the court to determine the proper beneficiary of the policy. Phoenix was subsequently dismissed from the action. The district court concluded that South Carolina's substantial compliance law is preempted by ERISA and that a federal common law doctrine of sub-

stantial compliance applies. 828 F.Supp. 379. Because the court found that Bill Adams intended to change his beneficiary from Jack to Rosita and that he took reasonable steps toward that end, the court concluded that Rosita was entitled to judgment and awarded the proceeds accordingly. Jack has appealed the district court's ruling. We agree with the district court's analysis, and, accordingly, affirm the judgment below.

## I. *BACKGROUND*

Bill Adams owned two insurance policies when he died in September 1990. The first, purchased from Mensa, had a face value of $50,000 and named his son, Jack, as the beneficiary. Jack testified that his father told him in the Fall of 1989 that he was the beneficiary on a life insurance policy. Jack also said that, when they had the conversation, he briefly saw the policy which had the amount $50,000 written on its face. He did not discuss the matter with his father again.

Bill acquired the second policy through his employer, Texfi Industries, Inc. Texfi provided life insurance to participating employees through a group insurance policy issued by Phoenix. Bill obtained both medical and life insurance through this program. When he acquired the policy in 1987, he designated his son Jack as the beneficiary.

The Group Certificate issued to Bill, which detailed the insurance provided by the group policy, contained the following language regarding the policy holder's right to change the beneficiary:

You may change the beneficiary by written notice to us signed by you. You may file it at any one of the following:

1. [The Insurance Company's] Home Office

2. The office of the Policyholder

3. The home office of your Employer.

Whether or not you are living on the date the notice is received, the change will take effect as of the date it was signed by you. However, the change will be without prejudice to us on account of any payments made by us before we received the notice.

Bill married Rosita in January 1990. They had lived together since 1986. Rosita testified that her husband told her sometime after they returned from their honeymoon that he wanted her to be the beneficiary of his life insurance policy with Phoenix. Rosita recalled that, shortly after their honeymoon, she heard Bill talking on the phone with an unidentified third party about his life insurance policy. Bill had called Rosita into the room during the phone call to ask her some questions about Martina, Rosita's daughter. When she came into the room, Bill was "talking about wanting to put Martina ... on his insurance." During the course of that conversation, Rosita also heard Bill tell the other party that he wanted to change the beneficiary on his life insurance policy to his new wife, Rosita.

A few days after that conversation, on February 22, 1990, Bill visited Texfi's home office in Rocky Mount, North Carolina in order to add his stepdaughter to his medical insurance and to change the beneficiary on his life insurance policy. While there, he spoke with a clerk in the personnel department, and they signed a "Dual Purpose" form designed to accomplish both goals. Bill did not, however, fill out the blank line next to the "Changed Beneficiary to" designation on the form. The Form did not indicate what actions Bill wished to take with respect to his beneficiary. The clerk immediately changed Bill's medical coverage to include his stepdaughter, but was unable to execute the change of beneficiary on the life insurance policy because she did not have access to his salary information.

The clerk told Bill that the Form would need to be submitted to Texfi's Corporate Finance Department to enable the change of beneficiary, and she forwarded the form to Jerry Holcombe. From 1984 until May 1990, Holcombe was the Financial Accounting Manager for Texfi Industries. Holcombe had the responsibility to see that benefits were handled through the personnel department. Because of the confidentiality of some of the salaries of the corporate division employees and the requirement that the benefits be calculated in accordance with those salaries, Holcombe had personal responsibility for a limited number of employees' benefits.[1] Bill Adams was one of those employees.

When Holcombe received the form forwarded by the clerk, he noted on the form that Bill had switched to family coverage but he did not complete the "Change Beneficiary to" line at that time. Two weeks later, on March 6, 1990, Bill phoned Holcombe directly to confirm the change to his policy. Holcombe testified that he recalled his conversation with Bill and that he specifically remembered that Bill requested him to make Rosita his new beneficiary. During or immediately after the telephone call, Holcombe wrote the following note to himself, "3–6–90 Bill Adams—Change beneficiary on life insurance to Roseta [sic] Adams (new wife)."[2] The note was added to a "to do" list he kept by the phone. He did not, however, make the necessary change to the Form at that time.

Holcombe quit working for Texfi in May 1990, several months before Bill died. At that time, he took all of his papers and personal belongings from his office and stored them at his residence in Rocky Mount, North Carolina. The note dated March 6, 1990 was among those papers. Holcombe did not explain why he did not make the necessary change to Bill's policy prior to quitting his job with Texfi.

On September 25, 1990, Bill died when the plane he was flying for Texfi crashed. His will directed that his debts and funeral expenses be paid and that the residue of his estate go to Rosita. Rosita gave Jack the

1. Holcombe testified that, as a rule, personnel handled the preparation of the change forms. Holcombe became involved in that administrative function only when the personnel office did not have access to the necessary information due to confidentiality concerns.

2. Holcombe testified that it was his habit or practice to make notes such as the one dated 3–6–90, and that he made such notes in the ordinary course of his duties and responsibilities as financial accounting manager. He also testified that he made the note substantially contemporaneous with the telephone conversation he had with Bill Adams. He indicated that he remembered the conversation independently of the note. The note, however, reminded him of the date on which the conversation occurred.

Mensa policy on which Jack was the named beneficiary, but Jack was unable to collect the proceeds on that policy due to the circumstances surrounding his father's death.

When Bill died, Dane Vincent, Holcombe's successor at Texfi, called Holcombe to ask whether Bill had attempted to change his beneficiary on the Phoenix policy. Holcombe responded that Bill had wanted to change the beneficiary and that he recalled the telephone conversation with Bill. He went through his papers that he had stored at home and found the Note dated "3–6–90." He provided that note to Texfi. Holcombe did not explain why he had failed to make the necessary change to the form at any time between the March 6, 1990 conversation and his May 1990 decision to leave the company. Because Holcombe took the note he wrote to himself with him when he left the company, no Texfi employee other than Holcombe could have made the requested changes to the form. At some point after Bill died, someone at Texfi finally wrote Rosita's name on the "Change Beneficiary to" line of the Form that Bill had signed.

After gathering the necessary information from Holcombe, Texfi indicated to Phoenix that Rosita was the designated beneficiary. In the course of its routine investigation, Phoenix discovered that Bill had never expressed in writing his intention to name Rosita as the new beneficiary. Phoenix wrote a letter to Jack, the named beneficiary, apprising him of the situation and asking him to relinquish any claim he might have to the proceeds or to come to some kind of agreement with Rosita. Rosita received a copy of the letter. Jack refused either option, and Phoenix's interpleader action followed.

Phoenix is a citizen of Connecticut and both Rosita and Jack Adams are citizens of South Carolina. The district court exercised diversity jurisdiction and, based on the role of ERISA in the case, exercised subject mat-

ter jurisdiction as well. Dismissed from the case on June 17, 1992,[3] Phoenix deposited the proceeds of the policy, $300,763.06, with the registry of the court. Following Phoenix's dismissal, the court issued a ruling based upon a record prepared jointly and submitted by both parties. The district court concluded that ERISA preempted the application of state law, and, applying a federal common law doctrine of substantial compliance, found in favor of Rosita.

## II.  *ERISA PREEMPTION*

■ The life insurance proceeds at issue in the instant case flow from a plan governed by the Employee Retirement Income Security Act of 1974 (ERISA). A threshold issue in the instant case is whether ERISA preempts the state common law doctrine of substantial compliance. When Congress enacted ERISA, it established a comprehensive statutory scheme to govern employee benefit plans.

> In ERISA, Congress set out to "protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal courts."

*Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44–45, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39 (1987).

ERISA's provisions preempt all state laws that "relate to" any employee benefit plan. 29 U.S.C. § 1144(a). ERISA does contain a saving clause, however, which exempts from preemption any state law "which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).[4] *See Pilot Life Ins. Co. v.*

---

**3.** In *Leimbach v. Allen,* 976 F.2d 912, 916–17 (4th Cir.1992), we held that the dismissal of an insurance company that had filed a Rule 22 Interpleader action did not destroy the court's jurisdiction. In that case the insurance companies were from New York and the claimants fighting over the proceeds were both citizens of Maryland. Because the district court had juris-

diction over the case when it was filed pursuant to 28 U.S.C. § 1332 and Rule 22, the district court retained jurisdiction even though the insurers were dismissed prior to final judgment. *Id.*

**4.** State law is defined as "all laws, decisions, rules, regulations, or other State action having

*Dedeaux,* 481 U.S. 41, 44–45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987). Cases arise in which state laws are preempted because they "relate to" employee benefit plans and because they do not "regulate" the insurance industry. In those cases, if ERISA does not provide any guidance on the issue before the court, the court may be in a position to create or apply federal common law. "Congress ... intended that the courts would 'develop a "federal common law of rights and obligations under ERISA-regulated plans." ' " *Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1452 (4th Cir.1992).

The district court found that South Carolina's doctrine of substantial compliance "relates to" an ERISA plan under § 1144(a) bringing South Carolina's substantial compliance law within the purview of the preemption provision. Jack has argued that the state law "regulates" the insurance industry under § 1144 and is thereby saved from preemption. The district court, however, found that the substantial compliance doctrine does not "regulate" insurance within the context of § 1144(b)(2)(A) and thus does not merit protection of the saving clause. Because ERISA does not explicitly address the change of beneficiary issue presented in this case, the court concluded that federal common law applies.[5]

## A. *"Relates to"*

The Tenth Circuit recently has addressed the question of whether ERISA preempts the state common law doctrine of substantial compliance in *Peckham v. Gem State Mut.,* 964 F.2d 1043, 1052–53 (10th Cir.1992).[6] In *Peckham,* a mother claimed that she was entitled to coverage for her newborn child by virtue of her substantial compliance with the terms of her policy with Gem State. The court held that the state's common law doctrine of substantial compliance was not preempted by ERISA. The *Peckham* court described the Act as follows:

> ERISA is concerned with state law doctrines that serve to modify a plan because such doctrines could destabilize the plan as well as subject it to conflicting state regulation. However, these concerns apply only where the potential modification is material. By definition, the doctrine of substantial compliance does not materially modify a plan, but rather is simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract.

*Peckham,* 964 F.2d at 1052. The *Peckham* court also cited the Supreme Court's language from *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983) as follows: "Some state actions may affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law 'relates to' the plan."[7] The *Peckham* court went on to address the merits of the plaintiff's substantial compliance argument under state law, ultimately finding against her.

In the instant case, the district court rejected the Tenth Circuit's analysis because the test of ERISA preemption "is not whether a state law *modifies* a plan, but whether a state law '*relates to*' a plan." *Phoenix,* 828 F.Supp. at 384 n. 6. The district court's analysis of the "relates to" language in the preemption provision is more persuasive than the Tenth Circuit's reasoning in *Peckham* and is more consistent with the guidance provided by the Supreme Court in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987). Under *Pilot Life,* if a state law relates to an employee benefit plan, the law is preempted

---

the effect of law, of any State." 29 U.S.C. § 1144(c)(1).

**5.** "Courts may develop such a federal common law only where ERISA itself 'does not expressly address the issue before the court.' ... Where the statute is silent, courts must construct a common law that effectuates the policies underlying ERISA.... In so doing, they may use state common law as a basis for new federal common law, but only to the extent that state law is not inconsistent with congressional policy concerns." *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 647 (7th Cir.1993) (citations omitted).

**6.** *Peckham* appears to be the only other circuit court case that addresses the ERISA preemption of state substantial compliance law.

**7.** *Peckham,* 964 F.2d at 1052.

by ERISA. The Tenth Circuit's reliance on the fact that state substantial compliance law does not appear to "modify" the ERISA plan is unduly restrictive in light of the Supreme Court's language in *Pilot Life:*

> In [*Metropolitan Life* [8] and *Shaw* [9]] we noted the expansive sweep of the pre-emption clause. In both cases "the phrase 'relate to' was given its broad common-sense meaning, such that a state law 're-late[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" ... In particular we have emphasized that the pre-emption clause is not limited to "state laws specifically designed to affect employee benefit plans."

*Pilot Life,* 481 U.S. at 47–48, 107 S.Ct. at 1553 (citations omitted).

Holding that the state substantial compliance doctrine did not relate to the benefit plan at issue, the *Peckham* court wrote that the doctrine of substantial compliance "does not denigrate from an ERISA plan in a way that is significant enough to implicate the concerns underlying ERISA preemption." *Peckham,* 964 F.2d at 1053. Under *Pilot Life,* however, such a statement is inapposite. As the district court noted, "[g]enerally, the designation of the beneficiary of an ERISA life insurance policy 'relates to' an ERISA plan." *Phoenix,* 828 F.Supp. at 384. Accord, *Metropolitan Life Ins. Co. v. Hanslip,* 939 F.2d 904, 906 (10th Cir.1991) (applying ERISA preemption provision because the designation of beneficiaries to the life insurance policy "relates to" the ERISA plan); *McMillan v. Parrott,* 913 F.2d 310, 311 (6th Cir.1990) (finding designation of beneficiaries "plainly relates" to the ERISA plans at issue). "Similarly, the doctrine of substantial compliance involves the determination of which of two or more purported beneficiaries will receive the proceeds of an ERISA life insurance policy." *Phoenix,* 828 F.Supp. at 384. Under *Pilot Life,* the substantial compliance doctrine, as applied to a change of beneficiary provision of an ERISA plan life insurance policy, does "relate to" the employee benefit plan at issue and to the determination of the appropriate beneficiary of Bill Adams' policy.[10] Consequently, we agree with the district court's conclusion that South Carolina's substantial compliance law is within the scope of ERISA's preemption provision.

### B. *The Saving Clause*

■ Jack has contended that, regardless of the fact that the state law "relates to the plan," it is nevertheless "saved" by the fact that it "regulates" the insurance industry. The saving clause allows the operation of state law despite ERISA in specified areas such as the insurance industry when the law in question "regulates" that area. The Supreme Court has set forth criteria for determining whether a state law "regulates" the insurance industry as required by the saving clause. First, a court must take what guidance is available from a "common-sense" view of the language of the saving clause itself. Second, the court must examine what are known as the McCarran–Ferguson factors: (1) "whether the [law] has the effect of transferring or spreading a policyholder's risk";[11] (2) "whether the [law] is an integral part of the policy relationship between the insurer and the insured"; and 3) "whether the [law] is limited to entities within the insurance industry." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48–49, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987).[12]

---

**8.** *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

**9.** *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900–01, 77 L.Ed.2d 490 (1983).

**10.** The district court also noted that "the application of different states' formulations of the doctrine of substantial compliance to the same set of facts can lead to inconsistent results," implicating ERISA's concern about uniformity. *Phoenix,* 828 F.Supp. at 384 (citing *Singer,* 964 F.2d at 1452).

**11.** An example of a law that might spread or transfer a policyholder's risk among all insureds is one that affects the types of illnesses or injuries an insurance contract covers or one that affects the cost of treatment. There is a conceptual difficulty in applying this criterion to the doctrine of substantial compliance.

**12.** In *Pilot Life,* the Court refers to these three criteria as the McCarran–Ferguson Act factors because the Court relied on the case law interpreting the phrase "business of insurance" under the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et*

In the present case, an examination of the considerations weighed in *Pilot Life* indicates that South Carolina's substantial compliance doctrine is not saved by ERISA's saving clause in that it does not "regulate" insurance. As noted in *Pilot Life*, "[a] common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Pilot Life*, 481 U.S. at 50, 107 S.Ct. at 1554. The state common law doctrine of substantial compliance is not specifically directed toward the insurance industry. Rather, the doctrine merely has an impact on that industry. The roots of substantial compliance law are firmly planted in the general principles of South Carolina's equity law, and the doctrine is applied in a diversity of contexts.

As to the McCarran–Ferguson factors, the first criterion does not apply and, conceptually, cannot be reconciled with the doctrine. The state common law of substantial compliance does not spread policy holder risk. As to the second criterion, the substantial compliance doctrine is not an integral part of the policy relationship between the insured and the insurer. As the district court noted, the ability of the insured to change the designated beneficiary is governed by the terms of the written policy, not state law. The neces-

sity for the application of the substantial compliance doctrine in the change of beneficiary context arises only after the death of an insured to assist in determining the proper beneficiary. In the words of the district court, "[t]he doctrine of substantial compliance merely provides that in the event the policy sets forth a method for changing the beneficiary, the insured need not literally comply with every aspect of that method in order to effect such a change." *Phoenix*, 828 F.Supp. at 385.

Most importantly, South Carolina's substantial compliance doctrine is not limited to entities within the insurance industry. South Carolina courts have applied the doctrine of substantial compliance as a general principle of equity law in contexts other than the insurance industry.[13] The use of substantial compliance in the instant case presents a specific application of a general principle, merely an extension of the equitable maxim that equity treats as done that which in good conscience ought to be done. *Wilkie v. Philadelphia Life Ins. Co.*, 187 S.C. 382, 197 S.E. 375 (1938).[14]

Because the substantial compliance doctrine of South Carolina does not satisfy the saving clause's criteria, the district court was correct in ruling that the application of the doctrine is preempted by ERISA.[15]

*seq.* in interpreting ERISA's saving clause. *Pilot Life*, 481 U.S. at 48, 107 S.Ct. at 1553.

**13.** *See S.C. Police Officers Retirement System v. Spartanburg*, 301 S.C. 188, 391 S.E.2d 239 (1990) (requiring municipal employer to contribute to retirement program to enable employee to upgrade his benefits despite the fact that employee had failed to file a written request and pay a special contribution prior to retirement in strict compliance with the governing statute); *Wright v. Southern Ry*, 74 S.C. 27, 54 S.E. 211 (1906) (finding substantial compliance with provisions relating to service of notice upon the magistrate). Substantial compliance has also been applied in the insurance context. *Horne v. Gulf Life Ins. Co.*, 277 S.C. 336, 287 S.E.2d 144 (1982) (holding that insured substantially complied with the manner of changing the beneficiary as required by the policy).

**14.** In *Wilkie*, the court analyzed a substantial compliance claim and, concluding that equity must follow the law, held that the deceased had not accomplished a change of beneficiary pursu-

ant to the contract method. *Wilkie*, 197 S.E. at 380.

**15.** The district court held that the substantial compliance doctrine was "not limited to entities within the insurance industry because [it] is merely a specific application of the general rule of contracts that 'if a party has substantially performed, it follows that any breach he may have committed is immaterial.' " *Phoenix Mutual Life Ins. Co. v. Adams*, 828 F.Supp. 379, 385 (D.S.C.1993) (citing the *Peckham* court's similar analysis found at *Peckham*, 964 F.2d at 1052). The *Peckham* court analogized the doctrine of substantial compliance to the doctrine of substantial performance. "By definition, the doctrine of substantial compliance does not materially modify a plan, but rather is simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract. *See* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* §§ 11–15 at 454 (3d ed. 1987) ("If a party has substantially performed, it follows that any breach he may have committed is immaterial.")."

## III. FEDERAL COMMON LAW

Although ERISA preempts the application of South Carolina's substantial compliance doctrine, the Act contains no provision expressly governing the change of beneficiaries pursuant to a given policy. ERISA is silent on the matter of which party shall be deemed beneficiary among disputing claimants. When ERISA fails to address an issue and the state law governing that issue has been preempted, the Supreme Court and the Fourth Circuit have authorized federal courts to develop federal common law of rights and obligations under ERISA-regulated plans. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989); *Singer*, 964 F.2d at 1452.[16]

### A. The Scope of the Power

■ As a preliminary matter, Jack has argued for the first time on appeal that the district court's power to fashion federal common law is limited and that the district court exceeded the scope of its power in the instant case. Rosita has argued that Jack's argument is procedurally barred because it was not raised below. *United States v. One 1971 Mercedes Benz, etc.*, 542 F.2d 912 (4th Cir. 1976).[17] Although we believe that Jack's argument is procedurally barred because it was not raised below, we acknowledge that the situation may present the exceptional circumstance contemplated in *One 1971 Mercedes*

Benz in light of the fact that we are creating new, albeit limited, federal common law. Consequently, we will address the merits of his argument.

Bill Adams obtained a life insurance policy under the plan at issue that explicitly allowed him to change the beneficiary "by written notice." Bill failed to file such a written notice with Texfi or with Phoenix. Jack claims that the court's application of the new federal common law effectively modified the written terms of the group life insurance policy at issue in violation of 29 U.S.C. § 1102(a)(1) and (b)(3).[18]

The statute requires that all ERISA plans be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and that the written instrument describe the formal procedures by which the plan can be amended, *id.* § 1102(b)(3).

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58 (4th Cir.1992).[19] Although Jack has acknowledged the court's general authority to create federal common law, he has suggested that 29 U.S.C. § 1102(a)(1) and (b)(3) circumscribe the court's power, preventing the court from modifying or supplementing an ERISA plan. He has cited *Singer* for the proposition that federal common law should not be used when "its application would conflict with the statutory provisions

---

It is perhaps most accurate to describe the doctrine of substantial compliance as an equitable principle often applied in the contract context and referred to interchangeably as substantial performance in that context. The term substantial performance is often used in the context of construction contract cases, while the term substantial compliance is often used in the context of tax law, the law of wills, and corporate law.

**16.** In *Krishna v. Colgate Palmolive Co.*, 1992 WL 176633, an unpublished opinion, the United States District Court for the Southern District of New York fashioned a federal common law of substantial compliance because "ERISA is silent on the matter of which party shall be deemed Beneficiary among disputing claimants." The district court relied primarily on New York law to conclude that a decedent's intent as expressed in a will or codicil is determinative when the insurance company has waived its right to require compliance with the contract by becoming a stakeholder in an interpleader action. *Id.* at * 3–4.

**17.** Below, Jack argued that he should be entitled to the proceeds based on an application of substantial compliance law. He did not submit the argument pertaining to potential modification of an ERISA plan. "Questions not raised and properly preserved in the trial forum will not be noticed on appeal, in the absence of exceptional circumstances." *One 1971 Mercedes*, 542 F.2d at 915.

**18.** The plan itself was not a part of the record before the court. The parties included only a copy of the Group Certificate which provides a statement of the insurance provided by the group policy. The Certificate is not a contract. The group policy is the only contract between the parties.

**19.** In *Coleman* we held that equitable estoppel was unavailable to alter the unambiguous terms of an ERISA welfare benefit plan. *Id.* at 60.

of ERISA ... or [would] threaten to override the explicit terms of an established ERISA benefit plan." *Singer*, 964 F.2d at 1452.

The doctrine of substantial compliance applied to discern the "real beneficiary" of a given life insurance policy does not effectively modify the ERISA plan by overriding explicit terms of the established plan. The plan at issue in the instant case permits the policy holder to change his beneficiary by taking prescribed steps. As the *Peckham* court noted, judicial recognition of an individual's attempt to take those steps and to comply with the requirements of his policy does not constitute a modification of the ERISA plan:

> By definition, the doctrine of substantial compliance does not materially modify a plan, but rather is simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract.

*Peckham*, 964 F.2d at 1052. Application of the doctrine in the instant context will not compromise any of the rights of or impose any additional obligations on plan administrators or sponsors. The doctrine does not conflict with ERISA's statutory provisions because ERISA is silent on the matter.

Jack has made the further argument that one of the fundamental goals of ERISA is uniformity of governing law. The most uniform execution of the law, as he sees it, would entail adherence to the explicit terms of a policy issued pursuant to a plan when such terms exist as they do here. He asserts that the Circuit Courts will apply a federal common law of substantial compliance differently both in their definition of substantial compliance and in the application of the doctrine to the facts. Although he presents a legitimate concern with respect to the latter point, the first point is without merit.[20] The district court's proposed definition should be adopted by other courts facing the issue as *the* federal common law definition. Although federal courts may differ in the way they apply the accepted doctrine to the facts of each case, they are not likely to differ substantially given a coherent, uniform formula. In any event, the risks of minimal non-uniformity of application should be weighed against the lack of substantial harm to plan administrators and sponsors and the relatively harsh results for employees and their families that would be engendered by a formalistic, overly technical adherence to the exact words of the change of beneficiary provision in a given policy.

### B. Creation of Federal Common Law

■ "That ERISA preempts state law, including state common law, does not mean that all common law concepts are automatically inapplicable in the ERISA context." *Thomason v. Aetna Life Insurance Co.*, 9 F.3d 645, 647 (7th Cir.1993). As noted in *Pilot Life* and in *Firestone Tire*, Congress anticipated the development of a federal common law of rights and obligations under ERISA. *Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1557–58; *Firestone Tire*, 489 U.S. at 110, 109 S.Ct. at 954. When state law has been preempted and ERISA is silent on the matter, federal common law may, in certain instances, be applied.[21]

When it is appropriate for a district court to exercise its authority to create and apply federal common law as it is here, courts "are constrained to fashion only those remedies that are appropriate and necessary to effectuate the purposes of ERISA." *United States Steel Mining Co. v. District 17, United Mine Workers of Amer.*, 897 F.2d 149, 153

---

**20.** *See Singer*, 964 F.2d at 1453 ("The prediction ... that use of preempted state common law doctrines to shape a federal common law of ERISA would frustrate Congress's goal of uniformity is unfounded.") ·

**21.** We have noted that the resort to federal common law generally is inappropriate when its application would: 1) conflict with the statutory provisions of ERISA; 2) discourage employers from implementing plans governed by ERISA; or 3) threaten to override the explicit terms of an

established ERISA benefit plan. *Singer*, 964 F.2d at 1452. We have also suggested that courts "should remain circumspect to utilize federal common law to address issues that bear at most a tangential relationship to the purposes of ERISA." *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992). The federal substantial compliance doctrine suggested by the district court does not pose any of these problems.

(4th Cir.1990).[22] One of Congress' purposes in enacting ERISA was "'to promote the interests of employees and their beneficiaries in employee benefit plans ...,' and 'to protect contractually defined benefits.'" *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1185 (4th Cir.1989). In enacting the preemption provisions, Congress also wanted "'to ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.'" *Singer*, 964 F.2d at 1452.

We have recognized that federal courts may draw on state common law in shaping the applicable body of federal common law. In *Provident Life & Acci. Ins. Co. v. Waller*, 906 F.2d 985, 992–94 (4th Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990), we recognized a remedy under the federal common law of ERISA by drawing on the preempted, state common law doctrine of unjust enrichment. In *Singer*, we rejected the district court's contention that courts should not look to state common-law causes of action that have been preempted by ERISA in fashioning federal common law. As we noted in *Singer*, "[t]he potential for plans and plan sponsors to be subject to

irreconcilable conflicting requirements is not presented by courts employing recognized state common law doctrines to assist in shaping the federal common law of ERISA. In fashioning federal common law, courts do not look to the law of a particular state, but rather should apply common-law doctrines best suited to furthering the goals of ERISA. Consequently, federal common law should be consistent across the circuits." *Id.* at 1452–53.[23] The district court in the instant case drew on recognized state common law of substantial compliance to formulate a federal common law of substantial compliance.[24]

The court defined the federal common law doctrine of substantial compliance as follows:

[P]ursuant to federal common law, an insured substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.

*Phoenix*, 828 F.Supp. at 388.

The evidence in the record establishes both Bill's intent to change his beneficiary

---

**22.** The device of federal common law does not authorize federal courts to smuggle state common law principles into ERISA without regard for the statutory text.... State rights and remedies that are expressly preempted under ERISA by 29 U.S.C. § 1144 may not be resuscitated as federal common law claims without an exacting examination of whether ERISA permits such a result.

*Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1453 (4th Cir.1992) (Wilkinson, J., concurring). Mindful of these words, it should be noted that the application of the federal common law developed by the district court in the context of the instant case would not impose any conflicting or undue burdens on plans or plan sponsors. As the ensuing discussion shows, however, the district court has presented a persuasive argument as to why the doctrine of substantial compliance may significantly impact the purposes of ERISA and thus, merit the development of federal common law.

**23.** In *Singer*, we went on to say that the prediction that "use of preempted state commonlaw doctrines to shape a federal common law of ERISA would frustrate Congress's goal of uniformity is unfounded." *Singer*, 964 F.2d at 1453.

**24.** Citing *Wilkie v. Philadelphia Life Ins. Co.*, 187 S.C. 382, 197 S.E. 375 (1938) (holding that insured had not substantially complied with the policy's change of beneficiary provisions when the hospitalized insured was physically unable to leave her bed and was unable to retrieve the policy from her lock box at the bank to return to the company for endorsement as required by the terms of the policy), and *York v. Summer*, 195 S.C. 413, 11 S.E.2d 864, 866 (1940) (holding that an insured has substantially complied with the change of beneficiary provisions of a life insurance policy when he has done all that he could to comply with the provisions), the district court characterized South Carolina's formulation of the substantial compliance doctrine as "an approach that borrows heavily from the doctrine of impossibility of performance." The district court declined to adopt South Carolina's formulation of the standard noting that the law of substantial compliance should mirror the doctrine of substantial performance on which it is based. The court also examined less exacting standards adopted by other jurisdictions. *Phoenix*, 828 F.Supp. at 387–88.

and his attempt to effectuate that change by working with Texfi's home office in Rocky Mount, North Carolina and with Jerry Holcombe. Although he did not submit a formal written notice, he attempted to do so by signing the dual purpose form intended to accomplish such changes. The change was not completed because Holcombe, the responsible Texfi employee, failed to make the change.[25]

By definition, substantial compliance is less than actual compliance. The point of the doctrine, whether found in federal or state law, is to give effect to an insured's intent to comply when that intent is evident. The insured decedent need not actually comply, but need only *substantially* comply with the change of beneficiary provisions of the policy to effectuate the desired change.[26] A federal common law of substantial compliance requiring that an insured intend to change his beneficiary and that he take positive action to effectuate that intent furthers the purposes of ERISA without compromising the integrity of policies issued by plan sponsors.

The provisions in ERISA plans which govern the ability of insureds to change their beneficiaries present a unique context in which the doctrine of substantial compliance may be applied without prejudice to the interests of plan sponsors and insurers. It is important to note that this is not a case in which an insured or a beneficiary is attempting to use an equitable theory to establish liability on the part of the administrator or the insurer when the written terms of the ERISA plan provide otherwise. Phoenix has acknowledged its liability under the plan and has deposited the proceeds with the court. The dispute is between the claimants.

We do not hold that the federal common law of substantial compliance is applicable in any context other than that before the court in the instant case, the change of beneficiary provision in an ERISA plan. Thus, we limit our holding to the facts before us. Such a holding comports with ERISA's purpose to benefit insured employees and their beneficiaries.

## IV. SUFFICIENCY OF THE EVIDENCE

Having decided that the federal common law of substantial compliance applies in the instant case, it is necessary to determine whether sufficient evidence supports a finding that Bill Adams substantially complied with the terms of his policy. In our evaluation of the sufficiency of the evidence, we review the district court's factual findings for clear error and conclusions of law *de novo*. We have held that whether the beneficiary to a life insurance policy has been changed is a question of fact. *Williams v. United States*, 243 F.2d 573, 573 (4th Cir.1957). Whether the policyholder took steps to effectuate the change is also a question of fact.[27] The

25. From this perspective, it appears that the failure to complete the change is the fault of the Texfi administrator. In such circumstances, the change would be deemed completed if analyzed under South Carolina law. In *Johnson v. Carolina Life Ins.*, 200 S.C. 308, 20 S.E.2d 713, 714 (1942), the Supreme Court of South Carolina held that "where the failure to complete a change of beneficiary is due to the neglect or delay of the insurer or its agents to make the proper endorsement thereof, the change is regarded as complete."

26. The district court applied federal common law to hold that Bill Adams had substantially complied with his policy's change of beneficiary provision. Despite the district court's skepticism about South Carolina's formulation of the substantial compliance doctrine, it would appear that, given the evidence of record, Bill Adams did substantially comply with the change of beneficiary requirements by taking all reasonable steps to accomplish that end. Even under South Carolina's comparatively exacting standard, the only

steps left to be accomplished with respect to the change of beneficiary to Rosita Adams at the time Bill died were steps that had to be taken by a Texfi employee. Bill had been assured by Holcombe that the necessary change would be made.

27. In *United Services Life Ins. Co. v. Moss*, 303 F.Supp. 72, 75 (W.D.Va.1969), the court held that whether there was sufficient action taken by the policyholder under the terms of the insurance policy to make the form at issue a valid change of beneficiary was a mixed question of law and fact. In that non-ERISA case, the court held that, under Virginia law approximating substantial compliance doctrine, the policyholder did not do all that was required of him under the policy or by law to effect the change. The court found that Moss had not clearly manifested an intent to change the beneficiary and that he had not done everything to the best of his ability to effect a change. *Id.* at 75, 76. In that case, Moss had inexplicably held onto his policy and

district court's formulation of the federal common law of substantial compliance doctrine is, of course, a matter of law reviewable *de novo*.

### A. *Admissibility of Relevant Evidence*

As a preliminary matter, Jack argues that the district court made errors of law and/or abused its discretion in admitting three pieces of evidence: 1) Rosita's testimony regarding a phone conversation her husband had with an unidentified third party about his intent to change the beneficiary on his Phoenix policy; 2) a note made by Jerry Holcombe during the course of a conversation with Bill confirming the fact that his beneficiary had been changed; and 3) a letter from Phoenix to Jack dated October 31, 1990. Without this evidence, Jack contends that the remaining evidence is insufficient to sustain the district court's decision in favor of Rosita. We review the district court's evidentiary decisions for an abuse of discretion.

Jack contends that, under South Carolina law, the district judge made several errors in his decisions to admit the foregoing items of evidence. Because the district court was correct in the conclusion that state law was preempted by ERISA and that federal common law applies, there is no need to address Jack's contentions regarding errors of South Carolina evidentiary law. The district court's admissibility decisions will be analyzed under the Federal Rules of Evidence.

1. Rosita's testimony regarding the telephone conversation between Bill and an unidentified third party

■ Jack's primary objection to Rosita's testimony is based on South Carolina's Dead Man Statute. Because federal law supplies the rule of decision in the case, the federal rules of evidence, not South Carolina's rules, apply. Federal Rule of Evidence 601 provides that the competency of a witness shall be determined in accordance with state law when state law provides the rule of decision with respect to an element of a claim or defense in a civil action. Here, it does not.

the necessary form for over two and a half years

As the district court noted, Rosita's testimony regarding her husband's telephone conversation is admissible under Federal Rule of Evidence (FRE) 803(3) as evidence of Bill's then-existing state of mind. Under 803(3) a statement of the declarant's then-existing state of mind including his intent, plan, or motive, is not excluded by the hearsay rule. In the telephone conversation, Bill expressed his intent to make Rosita the beneficiary of his policy. The evidence, then, shows Bill's intent, and, as the district court has noted, can be used "to prove subsequent conduct in conformity with [his] stated intention to change his beneficiary." *Phoenix*, 828 F.Supp. at 389. *United States v. Jenkins*, 579 F.2d 840, 842–43 (4th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

2. Jerry Holcombe's note memorializing conversation with Bill

■ The most important aspect of Jack's argument regarding Holcombe's note is its inconsequential nature. Even if the court should not have admitted the note, there is no basis on which to exclude Holcombe's unequivocal testimony that he definitely remembers receiving a phone call from Bill regarding the change of beneficiary, and that he specifically remembers that Bill wanted to name his new wife, Rosita. The existence of the note merely corroborated that memory.

Holcombe's testimony in and of itself evidences Bill Adams' intent to change the beneficiary on his Phoenix life insurance policy. Holcombe's testimony also establishes that Bill took substantial steps to effectuate that change. Due to the confidential nature of Bill's salary, Holcombe had the responsibility to make the necessary changes to Bill's policy. Holcombe testified that he was aware that Bill wanted the change made and that he made a note to himself to do it. He also testified that he did not make the necessary change. Holcombe did not offer any information that would lead the court to believe that Bill Adams subsequently changed his mind.

Regarding the admissibility of the handwritten note, Holcombe testified that it was

without sending them in to be endorsed.

his habit or practice to make such notes, that he made the notes in the ordinary course of his business, that he kept the pad on which he made such notes by his phone in his office as a "to do" list, and that he made the note substantially contemporaneous with the telephone conversation he had with Bill. Such testimony establishes the note as a hearsay exception under Rule 803(1) as a present sense impression, *i.e.*, a statement describing or explaining an event or condition made while the declarant was perceiving the condition or event or immediately thereafter. Jack's contention that the record reveals uncertainty as to when the note was made is incorrect. Holcombe's testimony is clear that he had a habit or practice of making such notes, and that he made the one pertaining to Bill Adams substantially contemporaneous with their conversation. The district court also held correctly that the note's implicit statement that Bill indicated a desire to change beneficiaries was admissible pursuant to 803(3).

3. The letter from Phoenix to Jack dated October 31, 1990

█ Regarding the letter of October 31, 1990, written to Jack from Barbara Gregory, an agent of Phoenix, the district court held the letter and the information contained in the letter admissible. The letter, outlining the actions Bill took to change the beneficiary of his policy from Jack to Rosita and explaining that Bill did not comply precisely with the policy's change of beneficiary's provisions, contains hearsay within hearsay. Phoenix obtained some of the information contained in the letter from Texfi employees. The letter includes the following statement: "Bill said he wanted to change the beneficiary of his life insurance policy." The district court admitted this statement pursuant to Rule 803(3) as a statement of Bill's intent. As Jack has argued, however, 803(3) requires a statement by the declarant, and the October 31 letter does not contain a statement by Bill. The letter does refer to records submitted by Texfi, which presumably included Hol-

combe's handwritten note recording a statement by Bill. The levels of hearsay, however, multiply under this analysis.

The court has also noted that the letter in itself is arguably hearsay but that Phoenix responded to a request for an admission by acknowledging that the letter was authentic and was a record of regularly conducted business activity within the meaning of Rule 803(6). As a prelude to its admissions, however, Phoenix specifically disavowed any admission with regard to the truthfulness of information verifiable only by persons or entities beyond its control including Texfi and its agents and employees. In addition, Phoenix qualified its admissions by objecting to the requests to admit to the extent that they required Phoenix to admit that conduct by others such as Texfi constituted regularly conducted activity for any person or entity other than Phoenix. It would seem that these qualifications render Phoenix's "admission" irrelevant to the admissibility of the hearsay within hearsay as to Bill's intent as discerned by Texfi. Because the letter does not fall within a recognized exception to the hearsay rule, it should have been excluded.

In any event, the letter to Jack recounting his father's attempt to change his beneficiary is not necessary to prove Bill's intent in light of the other evidence in the record.

B. *Sufficiency of the Evidence*

█ The court finds substantial compliance based on the evidence which was undoubtedly admissible. The evidence indicates that Jack intended to change his beneficiary. Rosita's testimony regarding her understanding of Bill's intent based on her own conversations with him is admissible. Bill's statement of intent to change his beneficiary made over the telephone to an unidentified party while Rosita was in the room is admissible pursuant to 803(3). The fact that Bill completed and signed the form to change his policy from individual medical coverage to family coverage on February 22, 1990 is uncontested.[28] The fact that Bill and the clerk

---

28. Jack has conceded that Bill completed the necessary form to change his group health coverage from single to family coverage. That same form, signed by Bill, was used by Texfi to accom-

plish changes of beneficiaries. Holcombe testified that he was unaware of any other form that Bill would have been required to complete to effectuate the change of beneficiary. Bill also

signed a Dual Purpose Form to effectuate the changes is evidenced by Holcombe's testimony regarding the Texfi form bearing Bill Adams' signature and by a copy of that form. The fact that Holcombe had the responsibility to make the changes to the policy based on the confidentiality of Bill's salary is uncontested. Holcombe's testimony regarding the fact that Bill contacted him by phone on March 6, 1990 to ensure that his policy was changed to reflect Rosita, his new wife, as his new beneficiary is admissible. The fact that Holcombe did not actually make the change that Bill requested is uncontested. After Bill died, Texfi officials altered the form to name Rosita Adams as beneficiary because Texfi had some reason to believe that Bill wanted the change to be made.

Bill's statements to Rosita, to the unidentified third party on the phone, and to Holcombe evidence his intent to change his beneficiary. By going to the home office of his employer and executing a form which he was told could provide the authority to change his beneficiary when submitted to the appropriate financial officer, Bill took steps to effectuate his intent to change the beneficiary. Bill took the additional step of following up by calling Holcombe on March 6, 1990 to confirm the change. Holcombe, the financial officer at Texfi, failed to complete the process by filling in Rosita's name on the form Bill had signed for that purpose. The evidence on the record establishes that Bill substantially complied with the policy's requirements for changing one's beneficiary, and, under the federal common law of substantial compliance, the district court's conclusion that Rosita is entitled to the proceeds of the policy is affirmed.

We therefore affirm the district court's opinion. Rosita is entitled to receive the proceeds of her husband's life insurance policy because he substantially complied with the provisions of the plan governed by ERISA.

*AFFIRMED.*

called Holcombe to confirm that the change had been made.