In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-3910

LINDA DAVIS,

*Plaintiff-Appellant,*

*v.*

DAVID COMBES and WENDY JACKSON,
as guardian of the estate of
ASHLEY COMBES, a minor,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. Nos. 98 C 1153,
98 C 4771, 98 C 7186—**Robert W. Gettleman**, *Judge.*

ARGUED MAY 7, 2001—DECIDED JUNE 28, 2002

Before FLAUM, *Chief Judge*, and RIPPLE and DIANE P.
WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This case pits a surviv-
ing husband and child against a sister in a fight over the
proceeds of three insurance policies. Brenda Combes was
the insured person; she died suddenly at the age of 43. Her
husband, David Combes, was surprised to discover that
Brenda had changed the beneficiaries on these policies (or
had tried to do so) from himself and the couple's daugh-
ter Ashley to Brenda's sister, Linda Davis. In time, two of
the insurance companies filed interpleader actions (one
in the Eastern District of North Carolina and one in the

Northern District of Illinois) to determine the rightful beneficiaries of their respective policies, and deposited the policy proceeds with the court. The third policy was part of a benefit plan established under the Employment Retirement Income Security Act, or ERISA. Linda filed her own suit in the Eastern District of Pennsylvania against the issuer of that policy and against David and Ashley (to whom we refer collectively as David, since their interests are aligned for present purposes), seeking a declaration that she was the sole beneficiary of that policy as well and demanding payment of the proceeds.

The Pennsylvania and North Carolina actions were later transferred to the Northern District of Illinois, the three cases were consolidated, and all contested proceeds were deposited with the court. After a one-day bench trial, the district court ruled in favor of David, relying principally on an alleged oral agreement described by David under which Brenda promised to maintain insurance for his benefit. While we do not doubt that David and Ashley were sympathetic figures, we conclude that the oral agreement is not sufficient under the law of Illinois to override a written designation of a beneficiary on an insurance policy. We also conclude that the flaws David identifies in the ERISA change of beneficiary form were not enough to defeat its effectiveness. We therefore reverse.

# I

Before Brenda and David were married in February 1994, each had life insurance policies that named family members as beneficiaries. Brenda had a $150,000 policy issued by Life Investors, and David had a $100,000 policy issued by Equitable Life Assurance Society. Less than a week before the wedding, Brenda made David the 67% beneficiary on her Life Investors policy, and David increased his

Equitable policy to $200,000 and made Brenda the 50% beneficiary. David testified that they took these steps to begin fulfilling their oral agreement "to provide for [each] other through the purchase and maintenance of life insurance."

Apart from this alleged oral agreement, David and Brenda kept their financial lives almost entirely separate after the marriage. For example, they did not have a joint checking account, joint credit cards, or joint investments; they did not file a joint tax return; and until July of 1997, when they co-signed a mortgage for a home, they had no joint interest in any assets. Instead, they covered joint expenses by repaying one another for particular expenditures. This was, however, something of a one-way street. Until 1996, David had very little to contribute to the household. He was a rather unsuccessful insurance salesman, with an income in 1994 of less than $2,000, and a 1995 income of less than $6,000. His financial picture brightened in 1996, when he took a position with a company that paid just under $40,000 per year. Brenda, in contrast, had advanced degrees in physical therapy and public health, including a Ph.D. from the University of Illinois, and regularly earned more than David: her 1995 income was about $71,000; her 1996 income was roughly $96,700; and her income in 1997, the year of her death, was about $90,000.

A year after their marriage, Brenda and David purchased additional life insurance. Brenda acquired a $50,000 policy from Continental Assurance Company and named David as the sole beneficiary, while David acquired a $50,000 policy from Continental and designated Brenda as the sole beneficiary. According to David, these actions amounted to further performance of the pre-nuptial oral agreement.

In May 1995 the couple's first child, Ashley, was born, and a few months later, Brenda began to work for Nova-Care, Inc. Through NovaCare's ERISA plan, she purchased

a $100,000 policy on David's life naming herself as the 95% beneficiary and Ashley as the 5% beneficiary. She also purchased a $100,000 policy on her own life, under which she named Ashley the 95% beneficiary and designated the remaining 5% for her sister Linda. A month later, David modified the beneficiary designations on his Equitable policy. He removed Brenda altogether from the policy and split it among Ashley (35%), his daughter from a previous marriage, Danielle (50%), and his mother (15%). In November of the same year, Brenda tinkered further with her NovaCare policy: she raised the amount to $272,000, she removed Linda as a beneficiary, and she designated an 80% share for Ashley and the remaining 20% for David.

When David started his job at Industrial Risk in January 1996, he took out a $135,000 policy on his life with Brenda as the sole beneficiary. In July of that year, he acquired a credit life insurance policy for $100,000, in which he named Brenda the residual beneficiary. The last insurance policy he purchased before Brenda's death was a $250,000 policy from Security Mutual Life Insurance Company of New York. He bought that policy in July 1997 and once again named Brenda the sole beneficiary.

Brenda, in the meantime, had begun making changes to her beneficiary designations, without telling David what she was doing. On August 16, 1996, she removed David from the Continental policy and named Linda the sole beneficiary. She did the same thing on September 3, 1996, to her Life Investors policy. Finally, she attempted to complete a change of beneficiary form for her NovaCare policy (which was issued by Reliance Standard Life Insurance Company), although the effectiveness of that effort is in dispute here. She filled out—in her own handwriting—the form NovaCare gave her. On that form, she provided all the necessary information, including her designation of Linda as the new beneficiary and September 1, 1996, as the effective date. She did not, however, sign and date the

form on the lines provided for that purpose. NovaCare's benefits coordinator, Linda Dean, accepted the form and entered the beneficiary change in NovaCare's computer files. Dean placed the hard copy of the form in Brenda's benefits file. Finally, Dean generated a letter entitled "Confirmation of Your 1996 Flex Benefit Choices." Unfortunately, the record does not indicate whether Brenda received her copy of that letter, but it does show that Brenda never received anything that would have suggested a problem with her effort to change the beneficiary on that policy.

To sum up, as of the fall of 1996 Brenda and Ashley were the beneficiaries of several policies on David's life, but Brenda had removed David and Ashley from her own policies (or attempted to do so, in the case of the NovaCare policy) and substituted Linda in their place. The couple had a second child, Julius, in November 1996, but he was not a beneficiary on any policy carried by either parent. David, as we have already noted, did not know about the changes Brenda had made. He discovered them only after her death.

Relying heavily on the alleged oral agreement, David challenged Linda's right to collect on the policies. The three insurers left the contestants to resolve this problem among themselves. With respect to the Life Investors and Continental policies, which Brenda had unambiguously amended, David argued that the district court should impose a constructive trust on the proceeds because Brenda committed fraud when she cut him (and Ashley) out of the picture. He also argued that the constructive trust was justified under a theory of promissory estoppel. With respect to the NovaCare policy, he urged that the attempted change of beneficiary was ineffective because it lacked Brenda's signature on the signature line of the form and that she was equitably estopped from effecting the change. After a bench trial, the district court found for David on all three policies: the court awarded David 67% of the Life Inves-

tors policy proceeds (*i.e.* $100,500), 100% of the Continental proceeds ($50,000), and 20% of the NovaCare policy ($54,400). Ashley received the remaining 80% of the NovaCare policy. Linda has appealed.

## II

The district court concluded that the parties' disputes over the Life Investors and Continental policies are governed by Illinois law, while federal law controls the ERISA claims concerning the NovaCare policy. No one has objected to this ruling on appeal, and we will thus proceed on that basis. See *McFarland v. General Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998); *Reilly v. Blue Cross & Blue Shield United*, 846 F.2d 416, 418 (7th Cir. 1988).

### A.  The Life Investors and Continental Policies

As we just noted, the district court concluded that David was entitled to have a constructive trust imposed upon the proceeds of the Life Investors and Continental policies. In so ruling, it found that he had successfully proven the elements of fraud, constructive fraud, and promissory estoppel, and that on the equities his claim to the proceeds was superior to Linda's. Linda counters that the district court, among other things, failed to assess the evidence under the proper legal standards, under which she claims she should have prevailed.

The doctrine of constructive trust pits fundamental principles of property against equally fundamental principles of equity. Then-Judge Cardozo recognized the tension when he noted that "[a] constructive trust is the formula through which the conscience of equity finds expression." *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 386 (1919), quoted in A.W. Scott and W.F. Fratcher, *The Law of Trusts*, § 462 (1989). But the right to dispose of one's prop-

erty is also firmly ensconced in our legal traditions, and so it is only "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, [that] equity converts him to a trustee." *Id.* Illinois decisively favors the "property" side of the balance and recognizes a strong presumption that the named beneficiary of a life insurance policy is entitled to its proceeds. *Travelers Ins. Co. v. Daniels*, 667 F.2d 572, 573 (7th Cir. 1981). The presumption is not, however, irrebuttable: it can be overcome on equitable grounds if the contesting party can show that she was deprived of the proceeds by (1) fraud or constructive fraud, (2) breach of a fiduciary duty, or (3) duress, coercion, or mistake. *Suttles v. Vogel*, 533 N.E.2d 901, 904-05 (Ill. 1988); *Smithberg v. Ill. Mun. Ret. Fund*, 735 N.E.2d 560, 565-66 (Ill. 2000). The district court referred to this line of cases and properly focused on the three theories of fraud, constructive fraud, and promissory estoppel. The problem with its analysis arose at the next stage, when it considered the proper burdens of proof.

The burden of proof on the issue whether a constructive trust should be imposed in this kind of case is a matter of state, not federal law. See, *e.g.*, *Shapiro v. Rubens*, 166 F.2d 659, 666 (7th Cir. 1948) (applying Indiana's "clear and convincing evidence" burden of proof); *Ohio v. Four Seasons Nursing Centers of America, Inc.*, 465 F.2d 25 (10th Cir. 1972) (applying Oklahoma's "clear and convincing evidence" burden of proof). Illinois courts have stressed that a party seeking to do so bears a heavy burden of proof. "The grounds for imposing a constructive trust must be so clear, convincing, strong, and unequivocal as to lead to but one conclusion." *Suttles*, 533 N.E.2d at 905; *Schultz v. Schultz*, 696 N.E.2d 1169, 1173 (Ill. App. Ct. 1998). Each element of the wrongdoing giving rise to the constructive trust must be established by clear and convincing evidence. *Rapp v. Bowers*, 348 N.E.2d 529, 533 (Ill. App. Ct.

1976); see also *Martin v. Heinhold Commodities, Inc.*, 643 N.E.2d 734 (Ill. 1992) (fiduciary relationship must be established by clear and convincing evidence). To be "clear and convincing," the evidence presented must "leave[ ] no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Parker v. Sullivan*, 891 F.2d 185, 188 (7th Cir. 1989), citing *Estate of Ragen*, 398 N.E.2d 198, 203 (Ill. App. Ct. 1979).

This heightened evidentiary burden exists to implement Illinois's substantive law emphasizing the "paramount" right of property owners while they are alive to dispose of their belongings (including the proceeds of life insurance policies) as they see fit, even if their decisions impair a marital partner's future interest in the property. *Wood v. Wood*, 672 N.E.2d 385, 388-89 (Ill. App. Ct. 1996) (title holder may dispose of home even if it might be considered marital property or spouse represented that it would be marital property); *Schultz*, 696 N.E.2d at 1173 (unless wife's rights vested, husband was free to change beneficiary on life insurance "on his own whim if he reserved the right to do so.").

Applied too liberally, the device of a constructive trust could undermine these rules of private property rights. It is our obligation, sitting in diversity, to respect the balance Illinois has established. The task is especially delicate in a case like this one, where the party whose disposition of the property has been challenged is dead and thus cannot counter the surviving party's version of the relevant events. See *Parham v. Hughes*, 441 U.S. 347, 365 n. 9 (1979). With few exceptions, therefore, see, *e.g.*, *Ziarko v. Ziarko*, 318 N.E.2d 1 (Ill. App. Ct. 1974), parties that succeed in imposing a constructive trust on life insurance proceeds have powerful evidence such as a written agreement to show how the property was intended to be distributed. See *Lincoln Nat'l Ins. Co. v. Watson*, 390 N.E.2d 506 (Ill. App. Ct. 1979) (agreement to maintain life insur-

ance in marital settlement agreement creates equitable right); *Perkins v. Stuemke*, 585 N.E.2d 1125 (Ill. App. Ct. 1992) (judicial decree ordering maintenance of life insurance creates equitable right); *Smithberg,* 735 N.E.2d at 566-67 (marital settlement agreement created vested contingent right in survivor benefit). Illinois has made this policy explicit for the case of prenuptial agreements regarding the disposition of life insurance policies: they must be in writing if they are to be enforceable. See, *e.g.*, Illinois Uniform Premarital Agreement Act, 750 ILCS 10/3; *Mina Lee v. Central Nat'l Bank & Trust Co.*, 308 N.E.2d 605 (Ill. 1974) (written document of oral prenuptial agreement sufficient to take agreement out of Statute of Frauds).

Nothing in the district court's opinion indicates that it evaluated David's evidence under the required "clear and convincing" evidentiary standard. Had it done so, we conclude, the verdict in his favor could not have been sustained. To qualify for a constructive trust, David needed to establish fraud or constructive fraud, or to make out a valid claim of promissory estoppel. The record shows that he did none of these things. To establish his claim for fraud, David had to prove by clear and convincing evidence that Brenda assured him that he was (and would remain, to some unspecified degree) the named beneficiary of her policies even after she knew that he was not. *Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992) (setting out elements of common law fraud). To prevail on his constructive fraud claim, David had to prove by clear and convincing evidence that Brenda promised to provide for him through life insurance and that this promise, together with the trust he placed in her as his wife, imposed upon her a fiduciary duty to disclose any changes in her beneficiary designations. See *In re Estate of Neprozatis*, 378 N.E.2d 1345 (Ill. App. Ct. 1978) (constructive fraud results from act, statement, or omission that constitutes a breach of legal or equitable duty). Finally, his promissory estoppel

theory required him to establish (again under the demanding standard of proof) the existence of Brenda's alleged unambiguous promise. See *Cullen Distributing, Inc. v. Petty*, 517 N.E.2d 733, 737 (Ill. App. Ct. 1987).

Other than his own testimony about Brenda's statements to him, David presented no direct evidence in support of any of these essential elements of his claim. The evidence is devoid of any writings suggesting the existence of the alleged oral agreement, either before or after Brenda began changing her beneficiary designations. Furthermore, not a single witness other than David mentioned an agreement or promise that David and Brenda had made to name one another as beneficiaries on their respective life insurance policies. Somewhat to the contrary, both David's mother and his close friend and insurance agent admitted that neither David nor Brenda ever mentioned such an agreement. The only support the district court identified for a finding that the agreement existed beyond David's testimony was (1) Brenda's statements to friends and relatives that the children would be taken care of in the event of her death, and (2) the couple's pattern of beneficiary designations starting just before the marriage in 1994. We find the latter two circumstances to be unhelpful at best: the "pattern" the court mentioned lasted just over two years and shifted during that time period, and the statement about providing for the children does not give any detail about who would be caring for the children or how this would be accomplished, and is consistent with a beneficiary designation of someone other than David.

This leaves David's testimony. While the admissibility of the testimony does not seem to be disputed, and is in any event controlled by the Federal Rules of Evidence, the weight to which the evidence was entitled is in part a function of the substantive law of Illinois. See *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 170 (7th Cir. 1992) ("where a state in furtherance of its substantive policy

makes it more difficult to prove a particular type of state-law claim, the rule by which it does this . . . will be given effect in a diversity suit as an expression of state substantive policy."). The Illinois Supreme Court has long warned that testimony from interested parties regarding what a deceased individual has said is "subject to great abuse and will be carefully scrutinized when considered with the other evidence in the case." *Monninger v. Koob*, 91 N.E.2d 411, 415 (Ill. 1950).

The facts of *Monninger* are instructive here. There, the plaintiffs claimed that an oral agreement between spouses who had later died entitled the plaintiffs to certain assets that had been left to the defendants in the wife's will. In order to prevail, the plaintiffs had to demonstrate the existence of the alleged oral agreement by "clear and satisfactory" evidence. *Id.* at 414. The Illinois Supreme Court upheld the dismissal of the plaintiffs' complaint, emphasizing that the only evidence of the agreement was the testimony of interested parties regarding the statements of the now-dead husband and wife. *Id.* at 414-15. The court discounted the testimony even though in those suits (unlike our case) there were several non-party witnesses, including the attorney who helped the couple draft their wills, who gave consistent and often detailed descriptions of the terms of the alleged agreement. *Id.* See also *Harper v. Kennedy*, 153 N.E.2d 801 (Ill. 1958) (testimony of interested family members insufficient to establish agreement even where supported by written document that could be read as consistent with alleged agreement).

The testimony here fell far short even of the records that the Illinois Supreme Court found insufficient in *Monninger* and *Harper*. David had not a single corroborating witness. His testimony at trial about the terms of the alleged agreement and its persistence throughout the marriage was general, conclusory, and, when it came to specifics, inconsistent. About the terms of the agreement, he could say

only that Brenda and he "were to provide for each other through the purchase and maintenance of life insurance." Beyond that he simply asserted that each of the beneficiary designations up until the late summer of 1996 was in furtherance of the agreement. Asked whether the agreement called for him to be the "sole" beneficiary of his wife's policies, David's sworn answers changed from no to yes and back to no over the course of the proceedings. On the subject of whether Brenda confirmed the agreement in any way during the marriage, either before or after her alleged breach, David could say only that he and Brenda had "discussed . . . plans regarding life insurance . . . when our children were born, [and] when the premiums were due." Later he added that they sometimes confirmed their agreement "when [they] were out having fun or at home having fun." When asked to give specific examples of those statements, David offered only that in December of 1997 he had asked whether everything was okay with the insurance and she said it was. In our view, given the strength of the substantive preference Illinois has for enforcing written beneficiary designations only, this evidence was insufficient as a matter of law to justify overriding the written policies.

## B.  The NovaCare Death Benefit

The district court also concluded that David and Ashley were entitled to their respective shares of the NovaCare policy according to the beneficiary designations Brenda had made prior to her September 1996 effort to substitute Linda as the sole beneficiary. The district court gave two reasons for finding in favor of David and Ashley on this part of the case: (1) federal common law estoppel, and (2) Brenda's failure properly to complete the beneficiary designation form.

Estoppel is at best a difficult theory to use with respect to an ERISA benefits plan. See, *e.g.*, *Downs v. World Color*

*Press*, 214 F.3d 802 (7th Cir. 2000). We noted in *Downs* that some circuits do not recognize any application of estoppel principles to modify an ERISA plan, and that this court has only gone so far as to hold that it *might* apply to an unfunded, single-employer welfare benefit plan. *Id.* at 806 (citing cases). In *Downs* itself, we had no occasion to decide whether estoppel might ever apply to other kinds of ERISA plans, because the plaintiff failed in the first place to establish the elements of estoppel. *Id.* The same thing is true here. Relying on our earlier decision in *Coker v. Trans World Airlines*, 165 F.3d 579, 585 (7th Cir. 1999), *Downs* identified four elements that must be proved before equitable estoppel will apply: (1) a knowing misrepresentation by the defendants; (2) in writing; (3) with reasonable reliance by the plaintiff on the misrepresentation; and (4) to the plaintiff's detriment. *Downs,* 214 F.3d at 805. David and Ashley's estoppel argument founders immediately on the second requirement: there was no writing of any kind documenting Brenda's alleged knowing misrepresentation to the effect that David and Ashley were still the beneficiaries of her NovaCare policy. The estoppel theory therefore cannot save David's case with respect to the NovaCare plan.

A more difficult question is whether the court properly determined that the change of beneficiary form was not effective. Brenda's failure to sign and date the form on the line provided for that purpose appears to have been at least a technical violation of both the NovaCare plan summary, which required her to "complete" the change of beneficiary form, and Reliance's requirements for changing beneficiaries. The policy provides that a beneficiary designation "will be effective on the date the insured signs it." Linda argues that notwithstanding the technical omissions, the change should be deemed effective because Brenda substantially complied with the policy requirements.

The concept of substantial compliance is part of the body of federal common law that the courts have developed for

issues on which ERISA does not speak directly. *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir. 1993). The precise question is whether it should apply to a signing requirement like the one presented in this case. There is no explicit requirement in ERISA that a change of beneficiary form must be signed and dated in a specific manner. See generally *Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554, 562 (4th Cir. 1994) ("ERISA is silent on the matter of which party shall be deemed beneficiary among disputing claimants."); compare *Butler v. Encyclopedia Brittanica* [*sic*], 41 F.3d 285, 293-94 (7th Cir. 1994) (rejecting substantial compliance doctrine where ERISA explicitly requires witness to signature).

The district court rejected Linda's substantial compliance argument without identifying the legal test it was applying or otherwise explaining its decision. It is unclear whether it thought that the signing requirement was so important that no deviation from it could be tolerated, or if it thought only that in the absence of sufficient justification a policy holder who fails to sign and date a beneficiary designation has not substantially complied with the policy's beneficiary designation requirements. As David and Ashley point out, the Ninth Circuit in *BankAmerica Pension Plan v. McMath*, 206 F.3d 821 (9th Cir. 2000), took the latter position. But the court made it clear in *BankAmerica* that it was applying the law of California to the issue of substantial compliance. California requires not just evidence of the policy holder's intent to change beneficiaries but also that the policy holder did "all he could" to effectuate the beneficiary designation. The court found that a decedent who, without apparent justification, failed to sign his change of beneficiary form was "[a]t best . . . careless" and "did not do all that he could have done." *Id.* at 831. He therefore did not substantially comply with the requirements for changing beneficiaries. *Id.* The Tenth Circuit also looked to state law with respect to substantial compliance

in *Peckham v. Gem State Mutual*, 964 F.2d 1043 (10th Cir. 1992), in which it was asked to determine the effect of an employee's imperfect filing. The question it asked, however, was whether "ERISA preempts the state common law doctrine of substantial compliance." *Id.* at 1052. It answered that in the negative, and then found that the claimant had failed in any event to show substantial compliance, without citing to any Utah case or any other authority. The court never considered whether federal common law might itself include a doctrine of substantial compliance, nor did it consider whether there might be any difference between such a rule of federal common law and the Utah doctrine. Under the circumstances, therefore, we do not find *Peckham* to be particularly useful on the question of the proper choice of law.

Other courts that have considered this question have opted for federal common law. Indeed, this circuit has already recognized that substantial compliance in the ERISA context is a matter of federal common law. *Butler*, 41 F.3d at 294 (a court can "adopt a substantial compliance doctrine as a matter of federal common law" unless ERISA speaks on the issue). See also *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987). The Sixth Circuit did the same in *Tinsley v. General Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000), where it reversed an application of state law and applied federal law to the issue of designation of an ERISA beneficiary, explicitly distinguishing the Ninth Circuit's reliance on state law. Likewise, the Fourth Circuit turned to federal common law in *Phoenix Mutual Life*, 30 F.3d at 564, a case remarkably similar to the one at bar, in which the court approved the following federal test for substantial compliance:

> . . . [A]n insured substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the

> change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.

*Id.* This test requires evidence of intent and substantial completion of the benefit change process, but it notably omits the "all he could have done" element that *Bank-America* concluded California law requires.

Although this court has applied the substantial compliance concept elsewhere in ERISA cases, see, *e.g.*, *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994), *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693-94 (7th Cir. 1992), we have not yet had occasion to consider whether it applies, and if so how, to an ERISA-regulated policy's change of beneficiary requirements. We did, however, face a similar claim with respect to a soldier's National Service Life Insurance policy proceeds in *Criscuolo v. United States*, 239 F.2d 280 (7th Cir. 1956), which also concerned an insurance claim governed by federal law. As the soldier lay dying in a hospital, he gave a staffperson a note indicating that he wanted to make his wife the beneficiary of his policy. The staffer obtained and completed a change of beneficiary form, but the soldier died before he was able to sign and submit it. We found substantial compliance, noting that while "the mere intent to change the beneficiary is not enough," "the intention, desire, and purpose of the soldier should, if it can reasonably be done, be given effect by the courts." Moreover, we said, "substance, rather than form, should be the basis of . . . [such] decisions." *Id.* at 282.

We see no reason not to apply the substantial compliance notion to this issue just as we do in other ERISA-related disputes. Not infrequently, we face the situation where an employee who was denied benefits under an ERISA-regulated plan claims that he was not properly notified by the plan administrator of the reasons for the denial, as re-

quired by 29 U.S.C. § 1133 and its implementing regulations. In that situation, we have held that the plan administrator's substantial compliance with the statute and regulations is sufficient. *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 180 (7th Cir. 1994); *Donato*, 19 F.3d at 382. In determining whether there was substantial compliance, "the purpose of 29 U.S.C. § 1133 and its implementing regulations . . . serves as our guide: was the beneficiary supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Donato*, 19 F.3d at 382. When the shoe is on the administrator's foot, then, the rule is that a harmless, technical slip-up on the plan administrator's part is not enough to undermine the legal sufficiency of her actions: a similarly minor inadvertence on the employee's part should lead to a parallel result.

In our view, the criteria the Fourth Circuit articulated in *Phoenix Mutual Life* are the correct ones. The fact that a policy holder made a careless error should not conclusively determine whether her efforts at naming a beneficiary were effective for purposes of the policy and the statute. Carelessness suggests a lack of attention to detail, but it tells us very little about whether the policy holder formed the necessary intent to name a beneficiary and whether she took sufficient steps consistent with that intent to implement her decision. We are aware that there will be situations in which a failure to sign and date a beneficiary designation may cast significant doubt on whether the policy holder actually decided to go through with the change. But it is equally true that there are other cases in which the evidence will unequivocally establish that the policy holder intended to make the new beneficiary designation and took positive action to effectuate that intent. *Cf. Becker v. Montgomery*, 121 S.Ct. 1801, 1808 (2001) (holding that failure to sign notice of appeal should

not be fatal where "no genuine doubt exists about who is appealing, from what judgment, to which appellate court").

The evidence in the case before us leaves no doubt about Brenda's intent to make Linda the sole beneficiary of her NovaCare policy. Brenda attempted to make the change at the same time that she successfully named Linda the beneficiary of the Continental and the Life Investors policies. She requested the change of beneficiary form from her employer and filled it out in her own handwriting. She completed the form in its entirety (including a September 1, 1996 effective date) with the exception of the signature and date lines. She then turned the form in to the NovaCare benefits coordinator, who accepted and processed the application as though it were complete. Whether or not Brenda received a letter confirming the change, we know she had no indication that the change was not effective. On these facts, her failure to sign and date the form can only be construed as carelessness. Given that all the other evidence indicates that Brenda intended to make Linda her beneficiary and took the steps necessary to do so, we conclude that Brenda substantially complied with the change of beneficiary requirements of the NovaCare policy and that Linda is entitled to its proceeds.

**III**

We do not know why Brenda chose to make Linda the sole beneficiary of her Life Investors and Continental life insurance policies in the fall of 1996, but that is what she did. Under Illinois law she was entitled to do so, even at the expense of her husband and child, unless she legally obligated herself in one way or another to designate only them as beneficiaries. David's testimony alone, especially given its vague and conclusory nature, simply cannot support a finding that Brenda took on such an obligation. Because Linda also established her entitlement to the NovaCare

policy proceeds under federal law, we REVERSE and direct the district court to enter judgment for Linda.

A true Copy:

       Teste:

                     _____
                     *Clerk of the United States Court of Appeals for the Seventh Circuit*