**SUN LIFE ASSURANCE COMPANY OF CANADA, Plaintiff/Stakeholder,**

v.

**Bonnie S. WASKO, Shana N. Wasko, Joshua A. Wasko, Individually and Joshua A. Wasko, as the Executor of the Estate of Daniel L. Wasko, Defendants/Claimants.**

**Bonnie S. Wasko, Third–Party Plaintiff,**

v.

**Dr. Pepper Snapple Group, Inc., Third–Party Defendant.**

No. 4:09–cv–00324–RAW.

United States District Court, S.D. Iowa, Central Division.

March 12, 2013.

William P. Rector, Bozeman Neighbor Patton & Noe, Moline, IL, for Plaintiff/Stakeholder.

Bryan J. Goldsmith, Gaumer Emanuel Carpenter & Goldsmith PC, Ottumwa, IA, for Defendants/Claimants.

. Steven T. Durick, Peddicord, Wharton, Spencer, Hook, Barron & Wegman, LLP, West Des Moines, IA, Scott J. Beattie, Peddicord Wharton Spencer Hook Barron & Wegman LLP, Des Moines, IA, for Third–Party Defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND ORDER

ROSS A. WALTERS, United States Magistrate Judge.

This matter is before the Court on the motions for summary judgment [64] [66] filed by the claimants to life insurance proceeds deposited in this Court by the original plaintiff/stakeholder Sun Life Assurance Company ("Sun Life"). In a Peti-

tion for Interpleader Relief and Request for Declaratory Judgment ("Petition") [1] filed August 21, 2009, Sun Life sought to deposit into court the death benefit proceeds of a group life insurance policy which insured the life of decedent Daniel L. Wasko. Sun Life was faced with conflicting claims to the proceeds. (Petition [1] at 4–5). Sun Life named as defendants/claimants Bonnie S. Wasko, the wife of Mr. Wasko, Shana N. Wasko and Joshua A. Wasko, his children, and the Estate of Daniel L. Wasko (Joshua A. Wasko, Executor).

Shana Wasko and Joshua Wasko ("the children") filed a cross-claim against Bonnie Wasko and a counterclaim against Sun Life, seeking a declaratory judgment they were the sole and equal beneficiaries of the life insurance proceeds. Bonnie Wasko filed a cross-claim against the children and a counterclaim against Sun Life, seeking, effectively, a judgment that all policy proceeds belonged to her. She also brought a third-party complaint against Dr. Pepper Snapple Group, Inc. ("DPSG"), Mr. Wasko's former employer, for negligent administration of the employee welfare benefit plan which included the group life insurance policy. That claim is not involved in the present cross-motions.

Sun Life filed a motion for leave to deposit funds and for entry of final decree of interpleader, which upon deposit sought discharge and dismissal [9]. Ultimately this was unresisted and by order entered April 8, 2010, Sun Life was directed to deposit the contested proceeds with the Court and was dismissed as a party. (Text Order [29] ). Court records indicate a total of $183,376.58 has been received from Sun Life.

The Court has subject matter jurisdiction of the claims as the policy under which benefits are payable is part of an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132(e) and 28 § 1331, 1335.[1] The case was referred to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c). Hearing on the summary judgment motions was held on November 19, 2012. The motions are fully submitted.

## I.

### SUMMARY JUDGMENT

A party is entitled to summary judgment only if, after viewing the evidence in the light most favorable to the opposing party and affording that party all reasonable inferences, see *Heartland Community Church v. Waddle*, 595 F.3d 798, 805 (8th Cir.2010); *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 922 (8th Cir.2002), the depositions, answers to interrogatories, admissions, affidavits, or other materials presented to the court, show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Preston v. City of Pleasant Hill*, 642 F.3d 646, 651 (8th Cir. 2011); Fed.R.Civ.P. 56(a), (c)(1)(A). Bonnie Wasko and the children agree that there are no disputed issues of material fact and that the cross-motions may be decided as a matter of law on the motion papers.

## II.

### FACTUAL BACKGROUND

Daniel Wasko was an employee of DPSG. DPSG had an employee benefits plan which included a Sun Life group life insurance policy, Policy No. 28938–001,

---

**1.** If not under ERISA the Court has supplemental jurisdiction of the negligence claim against DPSG. 28 U.S.C. § 1367(a).

with basic and optional life insurance benefits.[2] (App. [64–3] at 1051). The death benefit under the basic life component of the policy was $40,000; under an election made by Mr. Wasko, the optional life death benefit was $138,000, a total of $178,000. (Complaint [1] at ¶ 12). On November 12, 2007 Mr. Wasko, then single, completed a written group insurance beneficiary designation form which named the children as primary beneficiaries and Zoie M. Sindt (a granddaughter) as secondary beneficiary of his basic life, optional life (referred to as "Supplemental Life" on the form), and accidental death and dismemberment insurance. (Supp. App. [66–2] at 100).

In August 2008 Mr. Wasko married Bonnie Wasko. (App. [64–3] at 69).

DPSG's annual enrollment period for changes in employee benefits ran from November 10, 2008 and ended November 21, 2008. (App. [64–3] at 52). Enrollment changes could be made through DPSG's on-line website. (*Id.* at 53, 59). On November 19, 2008, Mr. Wasko attempted to log on to make changes. Unable to do so, the same date he contacted Hewitt Associates,[3] the third-party benefits plan administrator for DPSG, (*id.* at 106), by telephone. (*Id.* at 61). His first contact was with Hewitt benefits representative "Troy." Mr. Wasko had been locked out of the on-line system and needed a new password. (*Id.* at 61–67). He was unable to complete the enrollment over the telephone at that time because he did not have the necessary information in hand. Mr. Wasko called back later that day and spoke to another Hewitt representative, "Destiny," to complete enrollment. (*Id.* at 68). Mr. Wasko told Destiny he wanted to continue enrollment in a United Health Care Plan and add Bonnie who he had

married in August. (*Id.* at 69). He also added Bonnie to his dental and vision plans. (*Id.* at 71).

Destiny and Mr. Wasko then had the following conversation concerning his life and accidental death and dismemberment insurance coverage:

DESTINY: ... [Y]ou are covered under the employee basic life insurance for 40,000 dollars' worth of coverage; that's provided to you at no cost.

MR. WASKO: Okay.

DESTINY: And you're also currently in the employee optional life plan at six times your salary for $138,000 in coverage ... and did you want to remain in that one?

MR. WASKO: Yes.

DESTINY: Okay. And did you want to designate Bonnie as the primary beneficiary for that?

MR. WASKO: Yes.

DESTINY: Okay. I'll go ahead and take care of that. Okay, I've got Bonnie designated....

. . . .

DESTINY: ... Okay, and with the employee optional accidental death and dismemberment, you're currently at seven times your salary with a coverage amount of 151,000.... Did you want to remain there?

MR. WASKO: Yes.

DESTINY: Okay. And once again, Bonnie to be the primary beneficiary?

MR. WASKO: Yes.

DESTINY: Okay. I've got her signed for that one. Did you want to cover Bonnie on spouse life insurance?

MR. WASKO: Yes. It's Option 3.

---

**2.** The policy was issued effective January 1, 1996.

**3.** The Court infers from the record that Hewitt Associates is also known as, or does business as, HR Solutions.

DESTINY: For 100,000 dollars' worth of coverage?

MR. WASKO: Yes.

. . . .

DESTINY: So did you want to complete the enrollment?

MR. WASKO: Yes.

DESTINY: Okay. Okay, enrollment has been completed successfully. We're going to be sending out a confirmation of enrollment form to you on December 3rd, so Daniel, once you receive that, just go over it and make sure that everything is correct, and if not, be sure to give us a call back.

MR. WASKO: Okay.

(App. [69–3] at 71–73, 75).

DPSG followed up with a "Welfare Plan Beneficiary Confirmation Notice" dated November 19, 2008 showing Bonnie S. Wasko as primary beneficiary on "Employee Optional AD & D" and "Employee Optional Life" policies. (App. [69–3] at 79). The notice said nothing about the basic life coverage. The notice also stated:

This notice confirms your beneficiary designation(s) on file and is for your records only. Do not mark, revise, or return this form.

If you need to make corrections or make a new beneficiary designation, please access *Your Benefits Resources*™ Web site at *www.DPSGrewards.com* and make the appropriate change or call HR solutions at . . . and speak to a Dr. Pepper Snapple Group Benefits Representative.

(*Id.*) In addition, a "Dr. Pepper Snapple Group Inc. Confirmation of Password Reset" dated November 19, 2008 was forwarded to Mr. Wasko by DPSG providing him with a temporary password so he could access the system and create a new permanent password. (*Id.* at 80–81). The statement notified Mr. Wasko:

It is important that you carefully read the Authorization Statement below before you use your Password and Security Answers. This Authorization Statement, which is a legal agreement between you and Dr. Pepper Snapple Group, Inc., makes it possible for [DPSG] to offer you easy and convenient access to your personal information. By using your password and Security Answers, you agree to be bound by the terms of the Authorization Statement.

**Authorization Statement**

Your User ID, Password and Security Answers are used to verify your identity and allow you to access and affect changes to your personal information. When used, they serve as your electronic agreement, indicating that you agree to the following:

Any instructions, choices or requests you make through the Web site or HR solutions will be considered your written permission to Dr. Pepper Snapple Group, Inc. and HR Solutions to provide information or conduct transactions on your behalf, in accordance with the policies, programs, practices and benefit plans of Dr. Pepper Snapple Group, Inc . . .

(*Id.* at 81).

Mr. Wasko died December 24, 2008. (App. [69–3] at 82). On December 31, 2008 Joshua Wasko submitted a beneficiary claim form to Sun Life. (*Id.* at 89–91). On January 9, 2009 Shana Wasko submitted a beneficiary claim form to Sun Life. (*Id.* at 86–88). On January 12, 2009 Bonnie Wasko submitted a beneficiary claim form to Sun Life. (*Id.* at 83–85).

By letter dated January 29, 2009 Sun Life notified the claimants in pertinent part:

. . . According to the materials provided to Sun Life, Bonnie Wasko is named as beneficiary of the Policy on an Enrollment Card signed November 19, 2008.

On January 28, 2009 Joshua Wasko and Shana Wasko contacted Sun Life, and provided Sun Life with a letter and another beneficiary designation form and indicated their intent to contest the primary beneficiary named.

We believe, based on the foregoing, that Sun Life has been presented with competing claims to the death benefit proceeds. As a result, Sun Life will give each of you thirty (30) days from the date of this letter to resolve the matter between yourselves, if you so choose. If we do not receive notice by March 1, 2009, which you have agreed as to the disposition of the Policy proceeds, we will file a lawsuit naming each of the competing claimants as defendants, in order to interplead the funds into court.

(App. [64–3] at 92). There is no evidence in the record of a signed November 19, 2008 Enrollment Card. As evidenced by the present lawsuit, the parties did not come to an agreement.

To change a beneficiary, the Sun Life policy provides: "Any request for a change of Beneficiary must be in a written form and will take effect as of the date the Employee signs and files the change with the Employer." (App. [64–3] at 49). A "beneficiary" is defined as

... the person (other than the Employer) who is entitled to receive death benefit proceeds as they come due under this Policy. A Beneficiary must be named by the Employee on a form acceptable to Sun Life and executed by the Employee.

(*Id.* at 18). The "Claim Provisions" of the Sun Life policy include an "Insurer's Authority" clause which states:

The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations re-

garding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but it not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

Any decision made by Sun Life in the exercise of this authority, including review of denials of benefit, is conclusive and binding on all parties. Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious.

(App. [64–3] at 48).

In March 2008 Hewitt, in coordination with DPSG and Sun Life, was moving toward a system in which an employee could make a beneficiary enrollment or change on-line or by phone call to a Hewitt benefits representative followed by a paper confirmation to the employee and without the necessity of a signed document. (App. [64–3] at 98; *see id.* at 52, 94 (Aff. of Goodwin)). Later in the year an "Annual Enrollment Highlights" brochure was made available to employees. It explained the six "simple, easy steps" to enroll on-line during the November 2008 enrollment period. (*Id.* at 52–59). "There aren't any paper forms to return." (*Id.* at 59). The brochure gave a Hewitt phone number to call if an employee needed help enrolling. (*Id.*)

Scott Beliveau, Vice President of Underwriting and Claims in Sun Life's Employee Benefits Group, in a letter dated April 1, 2010,[4] wrote that "[w]hile the Sun Life contract states that changes must be in 'written form,' Sun Life interprets accept-

---

**4.** The letter was written over a year after the events in question in this lawsuit and after the lawsuit was filed. (App. [64–3] at 93).

ed changes in beneficiary information to include," in addition to hard copy beneficiary designations completed by the employee and electronic signatures:

> Voice recordings of an employee adding or changing a beneficiary(s) over the phone, with a subsequent letter confirming the change sent by the administrator to the employee. The employee would be required to sign and date this acknowledgment letter and return it to the administrator to keep on file.

(App. [64–3] at 93).

Sigismund L. Sapinski, Jr., Senior Counsel for Sun Life's Employee Benefits Group, wrote in a January 18, 2012 letter, with apparent reference to Mr. Beliveau's letter above, that Mr. Beliveau's comments were intended "to be prospective in nature" and concerned procedures to avoid designation disputes in the future. He continued that at the time of the events in this case

> ... Sun Life would accept information provided by Hewitt Associates regarding designations made by Dr. Pepper employees under Dr. Pepper's internal program. Sun Life would consider such information reliable because prior to the issuance of coverage, Sun Life was informed that safe guards were in place to insure that the employees involved were indeed making the designations. However, if Sun Life received a challenge to the designation as reported by Hewitt, such as fraud, coercion, etc., and competing claims were filed for the life insurance benefits, it would be Sun Life's practice that regardless of the reported safe guards, an interpleader action would be filed for a court to address those raised challenges.

(App. [64–3] at 99). In an affidavit a Sun Life claims analyst similarly characterized Mr. Beliveau's letter. (*Id.* at 95).

The Sun Life policy provided that any change to the policy was to be in writing, approved by a Sun Life officer, and endorsed or attached to the policy. (App. [64–3] at 93). There was no relevant change to the policy under this procedure.

## III.

## LEGAL PRINCIPLES AND DISCUSSION

### A.

DPSG's employee benefits plan is governed by ERISA, 29 U.S.C. § 1001, *et seq.* ERISA requires "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument," *id.* § 1102(a)(1), "specify[ing] the basis on which payments are to be made to and from the plan." *Id.* § 1102(b)(4). A participant or beneficiary of a plan may bring a civil lawsuit "to recover benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...." *Id.* § 1132(a)(1)(B).

The ultimate issue here is who is the beneficiary(s) of Mr. Wasko's life insurance death benefit proceeds "under the terms of [the] plan." Bonnie argues she is the sole beneficiary as a result of Mr. Wasko's November 19, 2008 telephone directions and the enrollment changes made by Sun Life on the basis of those directions. The Wasko children argue the beneficiary change was invalid because it did not conform to the policy requirements that the change be in writing and signed in some fashion, if not by hand, by electronic or telephone means under suitable protocol.

At the outset the Court must ascertain the ERISA standard which will guide its review. The standard is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Siegel v. Conn. Gen. Life Ins. Co.*, 702 F.3d 1044, 1048 (8th Cir.2013). The policy delegated to Sun Life the plan administrator's discretionary authority to determine claims and eligibility for benefits based on the enrollment information provided to Sun Life. While Sun Life enrolled Bonnie Wasko as the primary beneficiary under both Mr. Wasko's basic and optional life insurance coverages based on the November 19, 2008 telephone conversation, it did not exercise the discretion given to it to make a determination of who between the competing claimants is entitled to the proceeds. Sun Life made no decision on the claims as contemplated by the claim provisions in the policy. (*See* App. [64–3] at 48). It is evident from Mr. Sapinski's January 18, 2012 letter that Sun Life's practice, followed in this case, is that when faced with competing claims to life insurance proceeds Sun Life files an interpleader action "for a court to address those raised challenges." (*Id.* at 99). The decision having been left to the Court, review of the competing claims is *de novo. See Trustees of Electricians' Salary Deferral Plan v. Wright*, 688 F.3d 922, 926 (8th Cir.2012) (citing *Alliant Techsystems, Inc. v. Marks*, 465 F.3d 864, 868 (8th Cir.2006)) (*de novo* standard applies when administrator does not exercise discretion granted to it).

The children maintain the "plan documents rule" applied by the U.S. Supreme Court in *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S. 285, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009), and discussed in the Eighth Circuit's follow-up decision in *Matschiner v. Hartford Life and Acc. Ins. Co.*, 622 F.3d 885 (8th Cir.2010), "requires strict compliance with the terms of the ERISA based [insurance] policy," (Children's Brief [65–3] at 4), and supplants the substantial compliance doctrine which would otherwise govern.

In *Kennedy*, plaintiff's decedent was a participant in his employer DuPont's savings and investment plan (SIP). He named his wife as beneficiary of the plan benefits. Nearly twenty years later the couple divorced and the resultant divorce decree "divested [the wife] of all right, title, interest, and claim in and to" the proceeds of any retirement, pension or other employment benefit plan owned by plaintiff's decedent. 555 U.S. at 289, 129 S.Ct. 865. Plaintiff's decedent never executed documents removing his ex-wife as a beneficiary of the SIP, although he did execute a new form in favor of his daughter with respect to DuPont's Pension and Retirement Plan. When plaintiff's decedent died, the daughter, as executrix of his estate, asked DuPont to disburse the SIP funds to the estate. Relying on the decedent's beneficiary designation form, DuPont paid the SIP balance to the ex-wife. *Id.* at 290, 129 S.Ct. 865. The estate sued DuPont and its plan administrator on the theory "the divorce decree amounted to a waiver of the SIP benefits on [the ex-wife's] part," and payment to her violated ERISA. *Id.*

Although the argument between the *Kennedy* parties focused on whether the ex-wife's waiver in the divorce decree acted to assign or alienate her interest back to her ex-husband or his estate in violation of the anti-alienation provision of ERISA, or was otherwise a waiver barred by ERISA, the Supreme Court found the waiver issue was not the determining factor in deciding the case. Rather, the Estate's claim was determined by the "'terms of the plan,' [29 U.S.C] § 1132(a)(1)(B), a straightforward rule of hewing to the directives of the plan documents that lets employers '"'establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits.'"'" *Kennedy*, 555 U.S. at 300, 129

S.Ct. 865 (quoting *Egelhoff v. Egelhoff,* 532 U.S. 141, 148, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001), quoting in turn *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)). "[B]y giving a plan participant a clear set of instructions for making his own instructions clear, ERISA forecloses any justification for enquiries into nice expressions of intent, in favor of the virtues of adhering to an uncomplicated rule...." *Id.* at 301, 107 S.Ct. 2211. Because the SIP beneficiary-designation form had never been changed by plaintiff's decedent, DuPont's payment of SIP benefits to the ex-wife was in accordance with the plan documents. *Id.* at 304, 107 S.Ct. 2211.

*Matschiner v. Hartford Life and Acc. Ins. Co.,* 622 F.3d 885 (8th Cir.2010), involved similar facts, but, as here, concerned a group life insurance plan. Plaintiff's decedent originally designated sixty percent of her death benefits to her husband and twenty percent each to her daughters in a 1991 beneficiary designation form. In a 2000 divorce decree, the former spouses were each awarded their own life insurance policies and the cash proceeds of the policies. Plaintiff's decedent died in 2005 and the insurance company had to search for the designated beneficiaries, finding them in 2007. *Id.* at 886. One of the daughters advised a more recent beneficiary designation existed and that her father would disclaim his share. When contacted, the father stated he wished to collect his share and submitted a claim form. *Id.* In response the daughters submitted their competing claim forms and provided a copy of the 2000 divorce decree to the insurance company. *Id.* The daughters did not, however, submit the claimed more recent beneficiary designation form. *Id.*

Hartford paid out the policy benefits as directed in the 1991 beneficiary designation form. The daughters sued Hartford and their father to recover the benefit share paid to him. *Id.* The district court found the insurance company had abused its discretion in paying the death benefit to the father. In response to Hartford's motion to reconsider in light of the *Kennedy* decision, the district court distinguished *Kennedy* because the plan at issue did not contain a provision allowing for disclaimer of an interest. In a footnote the *Kennedy* court had said it did not address that situation. 555 U.S. at 303 n. 13, 129 S.Ct. 865. The district court ordered Hartford to pay the contested benefit to the daughters. The Eighth Circuit concluded the absence of a disclaimer provision in the policy did not avoid the "plan documents rule," believing it unlikely the Supreme Court intended to exempt welfare benefit plans which did not contain waiver-of-benefits provisions from the plan documents rule. The circuit held that as in *Kennedy,* "the plan documents, not the divorce decree, are controlling." *Id.* at 888, 129 S.Ct. 865. The insurance proceeds had been properly paid.

*Kennedy* and *Matschiner* stand for the proposition that the plan documents control ERISA-governed beneficiary changes, not that the plan documents must be strictly complied with by a participant who attempts to change a beneficiary or a plan administrator in implementing a beneficiary change. The cases are also factually distinguishable. In both the plan participant did not change, or attempt to change, a beneficiary. In both cases payments were made to who was shown as the beneficiary on the employer/insurer's records. Neither case necessarily supplants the substantial compliance doctrine which many courts, including Iowa's federal courts, have applied as federal common law in circumstances where an insured attempts to change the beneficiary of an ERISA-governed life insurance policy but fails to completely or technically comply

with all of the plan's requirements·for a beneficiary change. *See Davis v. Combes,* 294 F.3d 931, 941–42 (7th Cir.2002); *Phoenix Mut. Life Ins. Co. v. Adams,* 30 F.3d 554, 564 (4th Cir.1994); *Principal Life Ins. Co. v. Gorsche,* 733 F.Supp.2d 1077, 1081–82 (S.D.Iowa 2010); *Randles v. Metro. Life Ins. Co.,* 2005 WL 1277775, at *5–6 (N.D.Iowa 2005); *see also Prudential Ins. Co. of Am. v. Kamrath,* 475 F.3d 920, 924–25 (8th Cir.2007) (applying substantial compliance doctrine under state law); *Alliant Techsystems,* 465 F.3d at 870 n. 1 (noting the Eighth Circuit had not recognized the substantial compliance doctrine in an ERISA case and finding it unnecessary to apply in that case).[5]

In *Phoenix Mutual* the Fourth Circuit articulated the substantial compliance doctrine:

> Pursuant to federal common law, an insured substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.

30 F.3d at 564 (quotation omitted). The purpose of the doctrine is to "give effect to the insured's intent to comply when that intent is evident" thus furthering "the purposes of ERISA without compromising the integrity of the policies· issued by · plan sponsors." *Id.* at 565.

## B.

■ In this case Mr. Wasko complied with the procedure to change a beneficiary which he had been told he could use: by telephone directions to a benefits representative. Sun Life made the change based on what Mr. Wasko told the Hewitt benefits representative over the telephone. The children's complaint is that the policy procedures to change a beneficiary were not strictly followed. Though the context is different, the Court believes the substantial compliance doctrine is nonetheless an appropriate basis to resolve the competing claims here. If the law will enforce substantial compliance with change of beneficiary requirements when the insured's intended change fails for the lack of strict compliance with those requirements, it certainly ought to do so when the intended change is made notwithstanding the lack of strict compliance.

Evidently for the 2008 enrollment period Hewitt, with the agreement of DPSG and Sun Life, adopted an electronic beneficiary selection process Hewitt had proposed. (App.. [64–3] at 98). Sun Life agreed to accept· beneficiary changes based on a voice recording· of an employee making a change over the telephone to a Hewitt representative followed by confirmation sent to the employee. (*Id.* at 93). While Mr. Beliveau's April 1, 2010 letter describing this protocol . also· referred to a returned, signed acknowledgment by the employee, it is clear a signed acknowledgment was not part of the process. (*Id.* at 98–99). The "Annual Enrollment Highlights" brochure explained the six "easy steps" of on-line enrollment. (*Id.* at 52, 59). A phone number for HR Solutions was given for employees needing help. Employees were told there were no paper forms to return, (*id.* at 59), and the confirmation

5. ERISA itself "is silent on the matter of which party shall be deemed beneficiary among disputing claimants." *Davis,* 294 F.3d at 940 (quoting *Phoenix Mut. Life,* 30 F.3d at 562). As ERISA preempts state law in· suits ·to recover benefits from an ERISA-governed plan, *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 62–63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), resort must be taken to the developing body of federal common law under ERISA.

notice sent to Mr. Wasko did not ask him to return anything.

Mr. Wasko had difficulty enrolling on-line and called a Hewitt benefits representative to enroll. The representative reviewed Mr. Wasko's coverages with him in the course of which Mr. Wasko added his new wife, Bonnie, to his health, dental and vision insurance plans. The subject then turned to life insurance. The benefits representative, Destiny, first reminded Mr. Wasko of the $40,000 basic life insurance provided to him at no cost. Mr. Wasko responded simply "ok." Destiny next told him he was currently enrolled in the employee optional life plan at six times salary, $138,000 in coverage. She asked: "[D]id you want to remain in *that* one?" Mr. Wasko responded: "Yes." Destiny again asked: "Did you want to designate Bonnie as your primary beneficiary for *that?*" Mr. Wasko again responded: "Yes." Destiny said she would "take care of *that*," adding "okay, I've got Bonnie designated." (App. [64–3] at 71–72) (emphasis added). A confirmation notice was sent to Mr. Wasko noting Mrs. Wasko was now the primary beneficiary of Mr. Wasko's optional life insurance coverage. (*Id.* at 79).

The recorded conversation with Destiny and the follow-up confirmation notice clearly evince Mr. Wasko's intent to make his wife the primary beneficiary of the optional life coverage. It is true, as the children point out, that Mr. Wasko said nothing about eliminating the children as beneficiaries, but by designating Mrs. Wasko as the primary beneficiary for the optional life coverage, he must have known the optional life death benefit would go to his wife. At the outset of Mr. Wasko's conversation with Destiny he indicated that he had gone over his elections and knew what he wanted to enroll in. (App. [64–3] at 68–69).

■ The Court agrees with the children, however, that what passed between Destiny and Mr. Wasko is ambiguous with respect to the beneficiary of Mr. Wasko's basic life coverage, an ambiguity not cleared up by the subsequent confirmation which said nothing about the basic life coverage. The basic life and optional life insurance are two separate coverages. As Mr. Wasko's written 2007 beneficiary designation form indicates, an employee could select different beneficiaries for each, indeed the employee was required to signify on the form if the employee wanted the optional (supplemental) life beneficiary(ies) to be the same as the basic life beneficiary(ies). (Supp. App. [66–2] at 100).

Destiny first reminded Mr. Wasko of the basic life coverage provided to him at no cost, which he simply acknowledged. Destiny then addressed the subject of the optional life coverage. Mr. Wasko's responses to Destiny's questions about "that one" or "the primary beneficiary for that" can reasonably be taken as referring only to the $138,000 in optional life coverage. Mr. Wasko may have understood Destiny's latter inquiry to refer to both the basic life and optional life coverages. As Mr. Wasko added Bonnie as insured or beneficiary on all his other insurance, the Court can speculate that if asked who he wanted the beneficiary to be for his basic life coverage he would have responded similarly. But the conversation is unclear on the subject of the basic life coverage. The subsequent confirmation notice "confirm[ing] your beneficiary designation[s] on file" listing Bonnie as primary beneficiary only on the accidental death and dismemberment and optional life coverages, in response to which Mr. Wasko made no corrections or additional beneficiary designations as the confirmation notice invited him to do (Destiny had told him to go over the confirmation and call if not correct) is arguably consistent with the lack of intent to change the basic life beneficiaries. (App. [64–3] at 75, 79). Because Mr. Wasko's intent to

make a change is unclear, there was no substantial compliance with the Sun Life policy change of beneficiary provision and the children remain beneficiaries of the basic life policy proceeds.

It remains to assess the second prong of the substantial compliance doctrine with respect to the beneficiary change for the optional life coverage which Mr. Wasko clearly intended-whether the process used was "for all practical purposes similar to the action required by the change of beneficiary provisions of the policy." *Phoenix Mutual,* 30 F.3d at 564. The Sun Life policy states three requirements for a change of beneficiary: (1) the request must be in writing; (2) signed by the employee and (3) file[d] with the employer. (App. [64–3] at 49). Under the 2008 enrollment procedure put in place by Hewitt, Sun Life and DPSG agreed to accept recorded verbal change of beneficiary directions given by telephone to a Hewitt benefits representative so long as safeguards were in place to ensure the employee was in fact the one giving the verbal directions. There is no question but that Destiny was speaking with Mr. Wasko. He had to verify his identity at the outset of the telephone call. The conversation was recorded and has been preserved in a written transcript. In the Court's judgment recorded verbal beneficiary changes capable of being reduced to writing are for all practical purposes the same as a written change of beneficiary. Verification that the benefits representative is speaking to the employee and the employee's voice together are as reliable as any signature, perhaps more so. Finally, the employee's spoken beneficiary designations received by a benefits representative and the representative's indication that those designations have been made followed by written confirmation is the functional equivalent of "fil[ing]" a beneficiary change with the employer. The telephone means by which Mr. Wasko designated

Bonnie as the primary beneficiary of his optional life coverage was for all practical purposes equivalent to the requirements of the policy beneficiary change provision. The plan documents were substantially complied with. It follows Bonnie Wasko is the primary beneficiary of the optional life coverage.

## IV.

## CONCLUSION AND ORDER

The cross-motions for summary judgment [64] [66] are **granted in part and denied in part** in conformity with the foregoing findings and conclusions. The Court will at the appropriate time enter a declaratory judgment decreeing the respective rights of Bonnie Wasko and the children to the disputed life insurance proceeds and direct payment from the registry of the Court accordingly. Final judgment at this time is withheld, however, in view of Bonnie Wasko's remaining third-party claim against DPSG, the status of which may be affected by this ruling. Counsel are directed to confer and advise the Court within twenty (20) days of the status of the third-party claim. If it will be dismissed and not pursued, the Court will promptly enter a final judgment. If the claim will be pursued, the Court will set a conference with counsel to discuss the way forward. See Fed.R.Civ.P. 54(b).

IT IS SO ORDERED.